USDC IN/ND case 2:16-cv-00065-TLS   document 110-4   filed 07/29/19   page 1 of 7

ANCHOR HEALTH SYSTEMS v.  
DENNIS RADOWSKI, et al.
Cause No. 2:16-cv-00065-JVB-PRC 30(b)(6) deposition by ROBERT E. NIKSA  
June 27, 2018

**Page 29**

1  Q. Do you see anywhere in there where
2  it mentions a ventilator or respirator?
3  A. No.
4  Q. Did you -- were you aware of the fact
5  that Grace Radowski was in a comatose state?
6  A. Yes.
7  Q. So being in a comatose state, I assume no
8  one could assist her in walking, correct?
9  A. Correct.
10 Q. Getting in or out of the bed, correct?
11 A. Correct.
12 Q. Exercising or moving?
13   MR. TORRES: Objection. We're speculating
14 now. And you haven't laid a foundation that he would
15 even know how to answer that question.
16 BY MR. O'HARA:
17 Q. Well, do you know what "comatose" means?
18 A. Sleeping completely. Not moveable.
19 Q. It's --
20 A. Just --
21 Q. If I would say it is a semiconscious or
22 subconscious state of mind, would that be true?
23 A. My limited knowledge of comatose is
24 someone that is not cognizant of what's going on.
25 Q. So have you ever seen someone in a

**Page 30**

1  comatose state?
2  A. No.
3  Q. To your knowledge, would a person in a
4  comatose state be able to communicate whether they
5  were having pain or not?
6  A. To my knowledge, I don't think they'd be
7  able to communicate whether they have pain or not.
8  Q. Do you know -- in your opinion
9  then, what would be the difference between what a
10 skilled nurse can do and what an average person can
11 do in terms of caring for a person?
12 A. I'm not sure I understand the distinction
13 between the two categories.
14 Q. Well, what would be a situation that you
15 think would be ordinary, customary custodial care?
16 Can you describe it for me?
17 A. That's not medical treatment. It's
18 something less than medical treatment. Medical
19 treatment is restorative trying to improve the
20 patient's well-being, which is covered under the
21 plan.
22 Q. Right. So what would -- do you know if
23 skilled nurses have the ability to tell whether a
24 patient is in pain or not even in a comatose state?
25 A. I don't know whether a nurse would be

**Page 31**

1  able to tell if a patient is in pain if the patient
2  is in a comatose state.
3  Q. So did you know back in 2014 that
4  Grace Radowski was in a comatose state?
5  A. I did not. I did not know that at that
6  time until there was an appeal that was brought to
7  our attention.
8  Q. Okay. Well, there was an appeal filed in
9  2014, correct?
10 A. Yes.
11 Q. And does the name John Steinhart ring a
12 bell for you?
13 A. Yes.
14 Q. John Steinhart was an attorney that
15 represented Anchor Health Systems; is that correct?
16 A. Yes.
17 Q. And you had some communications back and
18 forth with him; is that right?
19 A. Yes.
20 Q. To your knowledge, did you ever say or
21 write to him anything that said a person in a
22 comatose state on a ventilator could still be
23 custodial care?
24 A. I don't recall whether the text in the
25 letter indicated that -- what you're suggesting.

**Page 32**

1  Q. When you -- when the appeal was processed
2  with the fund, did you consult any nurses regarding
3  the appeal?
4  A. Yes. When someone requests an appeal, we
5  obtain the records from the HIS department to include
6  that in the appeal.
7  Q. Okay. And so what records are you
8  referring to?
9  A. Whatever was involved with the -- with
10 the appeal from the provider. If they're providing
11 the medical records, then those records would be
12 included in the appeal.
13 Q. And where would those records -- were
14 they just for you to look at or anybody else?
15 A. No. The appeals are heard by a board of
16 trustees of the Calumet Fund.
17 Q. So today I was handed some records.
18       (The document was thereupon
19       marked for identification
20       as Niksa Exhibit No. 2, as
21       of June 27, 2018.)
22 BY MR. O'HARA:
23 Q. I'm going to hand you what's been marked
24 as Deposition Exhibit 2. I'll ask if you can
25 identify that?

EXHIBIT D

ANCHOR HEALTH SYSTEMS v.
DENNIS RADOWSKI, et al.
Cause No: 2:16-cv-00065-JVB-PRC 30(b)(6) deposition by ROBERT E. NIKSA
June 27, 2018

Page 33

1  MR. O'HARA: That was on the top page.
2  MS. STEWART JOHNSON: Top two pages?
3  MR. O'HARA: Yes.
4  MS. STEWART JOHNSON: 654?
5  MR. O'HARA: Yes.
6  MS. STEWART JOHNSON: And 655?
7  MR. O'HARA: Yes.
8  BY THE WITNESS:
9      A. I'm familiar with this.
10 BY MR. O'HARA:
11     Q. Okay. Is that a letter that you wrote?
12     A. I did not write that. I signed it. Tom
13 Pasco wrote it.
14     MR. O'HARA: Okay. I gave him my only copy.
15 Can I get a copy?
16     MR. TORRES: Yes.
17            (WHEREUPON, a discussion
18            was had off the record.)
19 BY MR. O'HARA:
20     Q. I assume you read that before you signed
21 it?
22     A. Oh, I did.
23     Q. Okay. Do you see anywhere in this
24 letter -- by the way, where was this letter supposed
25 to be sent to?

Page 34

1      A. This was a cover sheet for the appeal
2  committee meeting. That's what this was.
3      Q. Okay.
4      A. And that's what this is. It's called an
5  appeal transmittal. It's not sent to anybody.
6      Q. So you brought this with you?
7      A. No. This is -- this is the cover sheet
8  for the appeal that is presented to the trustees at
9  the appeals committee meeting.
10     Q. How is it sent to the trustees?
11     A. I don't know how exactly it was back
12 then, but it's e-mailed to them.
13     Q. E-mail. So this was the cover sheet that
14 was sent?
15     A. Yes.
16     Q. Would there have been any other
17 documents --
18     A. Yes.
19     Q. What other documents would --
20     A. It would have had the appeal letter that
21 came in from the provider -- if that's what the case
22 is -- or the appeal letter from the member would be
23 attached, along with medical records, and
24 communication with the provider.
25     Q. Okay.

Page 35

1      A. And the HIS department would be in here.
2  On the last page, they indicate what was attached as
3  enclosures.
4      Q. Okay. I don't see anywhere where it
5  talks anywhere about enclosures -- anything regarding
6  medical records. Do you see anything there?
7      A. I don't see anything in there.
8      Q. Do you think that would have been helpful
9  for the trustees to see?
10     A. I don't know if medical records are
11 something the trustees would even be able to review
12 normally. The medical decision as to whether this
13 was custodial was prepared by the medical expert.
14     Q. Okay. And your medical expert is?
15     A. It would be the HIS department nurses.
16     Q. Are there any doctors that work in the
17 HIS department?
18     A. No. We have a medical consultant that we
19 work with.
20     Q. Do you know the level of education of the
21 medical consultant?
22     A. No.
23     Q. Who pays the salary of the nurses in the
24 HIS department?
25     A. The health funds.

Page 36

1      Q. You mentioned in the section that talks
2  about review -- that's on the second page?
3      A. Uh-huh.
4      Q. Medicare Part A. Isn't it true that
5  letters -- that Mr. Steinhart said that she wasn't
6  covered by Medicare, but by Medicaid?
7      A. I do recall seeing that.
8      Q. In fact, don't the records of your office
9  show that Medicaid actually made some backcharges or
10 tried to charge the fund to pay them back for money
11 that they fronted?
12     A. I don't recall that.
13     Q. Okay. So are you the person that usually
14 presents or transmits the appeal information to the
15 trustees?
16     A. Yes. Our department does that.
17     Q. Okay. How many trustees are there?
18     A. Calumet Fund -- there's four -- four
19 people, and they have alternates.
20     Q. And I think back then you said that -- on
21 this document, it says it was Lisa Catanzara, Harry
22 Grow, Jeff Strack, and Dave Wilkinson were on the
23 trustee board at that time; is that correct?
24     A. What --
25     Q. I don't know. This was just provided

ANCHOR HEALTH SYSTEMS v.
DENNIS RADOWSKI, et al.
Cause No. 2:16-cv-00065-JVB-PRC
30(b)(6) deposition by ROBERT E. NIKSA
June 27, 2018

**Page 45**

1  A. No. I didn't have a conversation with
2  him about that.
3  MS. STEWART JOHNSON: I'm sorry.
4  Mr. Niksa, I'm having a little
5  trouble hearing you.
6  BY THE WITNESS:
7  A. I did not have a conversation with Tom
8  about Medicare at that time.
9  MS. STEWART JOHNSON: Thank you.
10 BY MR. O'HARA:
11 Q. Now, who made the determination that the
12 plan was tertiary to the City of Hammond, and I guess
13 it should have been Medicaid and not Medicare?
14 A. I'm suggesting that Tom Pasco is familiar
15 with those rules with regard to who's primary and
16 who's secondary and so forth.
17 Q. So you're not familiar with those rules?
18 A. I don't normally get involved with those
19 rules.
20 Q. We had gone over before the transmittal
21 that was done by e-mail to the trustees.
22 A. Right.
23 Q. I think that's Exhibit 2.
24 A. Yes.
25 Q. Okay. Did Tom transmit the information

**Page 46**

1  or did you?
2  A. Transmit?
3  Q. To the trustees?
4  A. Our department, I believe, would have
5  sent this to the trustees -- my department. Tom
6  would have prepared it and put it together.
7  Q. It also says here, "The trustees
8  determined that based on review by the fund medical
9  consultant" -- who is the fund medical consultant?
10 A. Dr. David Weiss.
11 Q. Okay. So do you have any reports from
12 Dr. David Weiss?
13 A. I can tell you David Weiss would have
14 been involved with the discussion with the trustees
15 on this appeal.
16 Q. When you say --
17 A. Because he was in the meeting.
18 Q. So he would have appeared with them at a
19 meeting?
20 A. Either through a telephone -- conference
21 call or personally.
22 Q. Okay.
23 A. He's part of the group that attends the
24 appeals meetings.
25 Q. Is Dr. David Weiss an independent

**Page 47**

1  contractor, or does he work for the plan as an
2  employee?
3  A. He's not an employee.
4  Q. What other duties does he have regarding
5  his connection with the plan, if any?
6  A. He consults -- he attends the board
7  meetings. He consults with the HIS department on a
8  regular basis.
9  Q. Do you know if there's any records
10 with regard to Grace Radowski that are written by
11 Dr. David Weiss?
12 A. No.
13 Q. No, you don't know --
14 A. I don't know of any.
15 Q. Don't know of any. Okay.
16 I'm going to show you now what's
17 marked as Plaintiff's Exhibit 3, which is really the
18 minutes of the meeting.
19 MR. TORRES: 656.
20 MS. STEWART JOHNSON: And it's all the rest?
21 MR. TORRES: No. It runs to 658.
22 MS. STEWART JOHNSON: Right. Right.
23 BY MR. O'HARA:
24 Q. Have you ever seen that document before?
25 A. Yes.

**Page 48**

1  Q. What is that?
2  A. It's the minutes of the appeals committee
3  meeting.
4  Q. And what is the date on that document?
5  A. September 12th, 2014.
6  Q. Okay. Does -- do you know if Tom Pasco
7  attended that meeting?
8  A. If he did, it would have been on here.
9  He didn't appear.
10 Q. I've looked through this document.
11 Where in the document does it --
12 where is it referring to Grace Radowski? Do you
13 know?
14 A. What document are you looking at?
15 Q. The trustee minutes.
16 A. Oh, yes. It would be on Page 3. I
17 believe it's No. 3.
18 Q. Okay. And for the record, would you mind
19 reading where it says -- starts with "an appeal"?
20 A. Just read this (indicating)?
21 Q. Yes.
22 A. "An appeal was received from the denial
23 of benefits on the ground that coverage for the
24 participant's care was excluded as custodial under
25 the terms of the plan."

USDC IN/ND case 2:16-cv-00065-TLS document 110-4 filed 07/29/19 page 4 of 7

ANCHOR HEALTH SYSTEMS v.  
DENNIS RADOWSKI, et al.
Cause No. 2:16-cv-00065-JVB-PRC
30(b)(6) deposition by ROBERT E. NIKSA  
June 27, 2018

Page 49

1 Q. And then the highlighted portion?
2 A. "Upon motion by Harry Grow and seconded
3 by Jeff Strack, the trustees unanimously resolved to
4 deny the appeal on the ground that coverage for the
5 participant's care was excluded as custodial under
6 the terms of the plan."
7 Q. Okay. Now, let's go back to Exhibit 4.
8 A. (Witness complying.)
9 Q. If you look down there, you'll see
10 there's a first paragraph that goes, "Dear
11 Mr. Steinhart," and then there's a first paragraph.
12 Then there's the second paragraph that has No. 1 and
13 No. 2.
14     Do you see that?
15 A. Yes.
16 Q. And then there's a third paragraph.
17     Would you read the first sentence
18 there?
19 A. You're talking about right here
20 (indicating)?
21 Q. "The trustees" --
22 A. "The trustees fully reviewed the appeal
23 and found that the plan was tertiary to the City of
24 Hammond (Grace Radowski's husband's group health
25 plan) and Medicare based on Mrs. Radowski's election

Page 50

1 of COBRA as of May 1, 2012. Secondly, the trustees
2 determined that, based on review by the fund medical
3 consultant, the care provided by Anchor Health
4 Systems during the period in question was custodial
5 in nature and consequently excluded under the plan.
6 For these reasons, the claim determination was
7 upheld."
8 Q. Okay. Now, when I'm reading the minutes
9 of the meeting, I don't see any language in there
10 that says the trustees found that the plan was
11 tertiary.
12     Do you see any language in there
13 that says that?
14 A. No.
15     (The document was thereupon
16     marked for identification
17     as Niksa Exhibit No. 5, as
18     of June 27, 2018.)
19 BY MR. O'HARA:
20 Q. I'm going to show you what's been marked
21 as Plaintiff's Exhibit 5. I believe this is Cal Fund
22 659.
23     What is that document, sir?
24 A. This looks like a summary of charges.
25 Q. Okay.

Page 51

1 A. On behalf of Grace Radowski.
2 Q. Okay. And I assume you were aware of the
3 fact that Anchor Health Systems was taking care of
4 Grace Radowski from the period of time from June 10th
5 through October of 2013?
6 A. Yes.
7 Q. So would this be related to the charges
8 that they submitted --
9 A. Yes.
10 Q. -- to the fund?
11 A. Yes.
12 Q. Okay. And let's go through the
13 charges -- you have dates of services and then you
14 have some dates.
15     So that would be the dates of
16 services that they provided; is that correct?
17 A. Yes.
18 Q. And then you have a claim number.
19     Is that your claim number or theirs,
20 or how does that work? Do you know?
21 A. I'm not familiar with that claim number.
22 Q. Okay. And then you have total charge.
23     I assume that's the amount that they
24 submitted as a charge; is that correct?
25 A. I would say yes.

Page 52

1 Q. Okay. And then you have a column that
2 says, "BCBS allowance"; is that correct?
3 A. Yes.
4 Q. What does that stand for?
5 A. I would say that this means -- this is
6 what would be payable if these charges were, in fact,
7 covered under the plan.
8 Q. Okay. So if they were covered by the
9 plan, instead of the $85,600, it would be $49,191.36
10 that they would pay?
11 A. Yes.
12 Q. So I'm going to show you this, which was
13 the 30(b)(6) deposition, and it has Exhibit A on
14 there. I'm going to go through these different
15 items.
16     Were you ever showed this before
17 today?
18 A. No. I don't believe I've seen this --
19 Q. Okay.
20 A. -- in this fashion. I would have
21 noticed -- well, it's hard to read.
22 Q. Unfortunately, my copier didn't copy
23 right the first page. I hope this third page is
24 legible.
25     So I'm going to go through these

Page 61

1 within Cal Fund who makes the determinations on
2 sequence of coverage, whether -- you know, comparing
3 policies and which one might be primary or secondary
4 or tertiary; is that right?
5    A. Yes. He's involved in that.
6    Q. And do you -- and forgive me if you've
7 already answered this, which you probably have.
8       But do you weigh in on that? Do you
9 examine the different provisions of the policies and
10 assist with that determination?
11    A. I normally do not.
12    Q. Okay. Have you reviewed the coordination
13 of benefits provision of the City of Hammond Plan?
14    A. No.
15    Q. Okay. And -- or any sort of other
16 insurance provision of the City of Hammond Plan?
17    A. No.
18    Q. Have you reviewed the City of Hammond
19 Plan at all?
20    A. No.
21    Q. Okay. And when you were testifying about
22 the procedure for -- when claims were submitted, you
23 mentioned that a claim is submitted by a provider,
24 the nurse reviews it and maybe asks some questions or
25 gathers information, and then the nurse enters it

Page 62

1 into the system. Is that when it's then submitted to
2 Blue Cross Blue Shield?
3    A. Are you referring to the nurse or the
4 claims process?
5    Q. The claims process.
6    A. Yes.
7    Q. Okay. And then is there a step beyond
8 that, or is that the end of it for Cal Fund?
9    A. The claim is processed, and then a file
10 goes back to Blue Cross Blue Shield. And then the
11 explanation of benefits is produced and mailed out.
12    Q. From Cal Fund?
13    A. Yes. We have a vendor that does that.
14    Q. Who is your vendor?
15    A. Change Healthcare, I believe, is the name
16 of the company.
17    Q. How do you spell that?
18    A. Change.
19    Q. Change?
20    A. Change Healthcare. They produce the
21 explanation of benefits for us and mail them out.
22    Q. Is Change Healthcare involved at all in
23 coverage determinations?
24    A. No.
25    Q. Who has the final say in coverage

Page 63

1 determinations within -- within Cal Fund?
2    A. The interpretation of the plan is the
3 sole responsibility and authority of the board of
4 trustees.
5    Q. And is there anybody on the board -- is
6 there any trustee in particular who seems to have --
7 at the time in question -- and I guess we can look
8 at -- who the trustees were at the time who were --
9 between Lisa Catanzara, Harry Grow, Jeff Strack, and
10 Dave Wilkinson -- was there another one? Just the
11 four?
12    A. Yes.
13    Q. Okay. And is there one of those folks
14 who was responsible for the coverage determination,
15 or was it a group thing?
16    A. Well, it's a group thing. It's not an
17 individual.
18    Q. Who would you say of those four trustees
19 has the -- has a background in making coverage
20 determinations?
21    A. I'm not familiar with their background.
22    Q. Did any one of those four -- well, you
23 were present at this meeting, correct?
24    A. Yes.
25    Q. And we're talking about Exhibit 3.

Page 64

1       Did any one of those four --
2 Ms. Catanzara or Mr. Grow or Mr. Strack or
3 Mr. Wilkinson -- speak to the coverage determination
4 for Grace Radowski?
5    A. I don't recall.
6    MS. STEWART JOHNSON: Okay. Those are all of
7 the questions. Thank you.
8    MR. TORRES: A couple of questions.
9       EXAMINATION
10 BY MR. TORRES:
11    Q. Counsel showed you Exhibit A from the
12 deposition notice. And I believe the first one
13 involved communications with Dennis Radowski.
14    A. Which document are you referring to?
15 This one (indicating)?
16    Q. Yes.
17       Now, you said you couldn't answer
18 that question, but you have -- in your review of the
19 file, have you reviewed communications between the
20 fund and Dennis Radowski?
21    A. Yes.
22    Q. Okay.
23    A. There was something in the file.
24    Q. Okay. Not all -- do you know -- do you
25 remember if any of them were sent by you?

USDC IN/ND case 2:16-cv-00065-TLS document 110-4 filed 07/29/19 page 6 of 7

| ANCHOR HEALTH SYSTEMS v. DENNIS RADOWSKI, et al. | Cause No. 2:16-cv-00065-JVB-PRC 30(b)(6) deposition by ROBERT E. NIKSA June 27, 2018 |

Page 65

1  A. No.
2  Q. Just to make it clear, again, for the
3  record, do you have any background in medical -- in
4  medical or providing medical services -- medicine or
5  providing medical services?
6  A. No, I do not.
7  Q. And you don't have any training as a
8  nurse or just providing medical care to people?
9  A. No.
10 Q. If you could look at -- I believe it's
11 Exhibit 5. There's a -- do you see the column that
12 says "total charges" or "total charge"?
13 A. Yes.
14 Q. What is the total for that on the --
15 A. $85,600.
16 Q. Do you see the column that says "BCBS
17 allowance"?
18 A. Yes.
19 Q. What is the total?
20 A. $49,191.36.
21 Q. So, again, what is the $49,000 represent?
22 A. I would say this represents what the plan
23 would pay if these charges were covered under the
24 plan.
25 Q. So then what happens -- so if the total

Page 66

1  charges are about 85,000, then how -- who pays that
2  difference?
3  A. Nobody. That balance isn't billed to
4  anybody. That's part of being in the Blue Cross
5  Plan.
6  Q. Okay.
7  A. It's written off.
8  Q. Is Dr. David Weiss present at all of the
9  appeal hearings?
10 A. Yes. Or he calls in.
11 Q. And he is a doctor, right?
12 A. Yes.
13 Q. And he puts his input into these
14 decisions?
15 A. Yes, he does. And he answers all of the
16 questions that come up.
17 Q. And the trustees, along with the
18 documents provided from the HIS department, they make
19 their decision based off HIS and Dr. Weiss' opinion?
20 A. Yes.
21 MR. TORRES: No further questions.
22 MS. STEWART JOHNSON: And can I just -- a
23 point of clarification, Jon, did you have this marked
24 as Exhibit 5, and I just missed it?
25 MR. O'HARA: I believe it is.

Page 67

1  MS. STEWART JOHNSON: It is?
2  MR. O'HARA: Yes. The court reporter marked
3  that.
4  MS. STEWART JOHNSON: Great. Thank you.
5  FURTHER EXAMINATION
6  BY MR. O'HARA:
7  Q. I'm going through the minutes again,
8  Mr. Niksa, and it appears that you were present at
9  the meeting; is that correct?
10 A. Yes.
11 Q. Mr. Ryan was present?
12 A. Yes.
13 Q. Did you speak at that meeting?
14 A. Normally, I wouldn't speak at the meeting
15 if Dan was there.
16 Q. Okay.
17 A. I had just started. I don't recall Dan
18 speaking at that meeting.
19 Q. And David Mineau, who is he?
20 A. He's the finance director at our front
21 office.
22 Q. Okay. So would he have anything to say
23 with regard to the issues that are in this case?
24 A. No.
25 Q. Okay. What about Donna Bennett, Segal

Page 68

1  Consulting?
2  A. She's the plan consultant that works with
3  the trust fund.
4  Q. Okay.
5  A. That works for Segal.
6  Q. And when you say, "the trust fund," what
7  does that mean?
8  A. The Calumet Fund.
9  Q. Okay. Does she have any input as to the
10 language of the plan?
11 A. Again, they're plan consultants, so I
12 would say I guess she has input. Segal Company is
13 the consulting fund that the trustees have used for
14 years.
15 Q. Do you know if Segal Consulting is a --
16 have lawyers in their department?
17 A. I'm not sure.
18 Q. Okay. And then the next one down is
19 David Weiss, M.D. I'm skipping over Jessica Streit
20 because I assume she's the same sort of situation.
21 It says, "via telephone." Did you
22 hear Dr. Weiss talk that day?
23 A. Yes.
24 Q. Do you know what he talked about?
25 A. Probably -- well, no. I don't recall the

USDC IN/ND case 2:16-cv-00065-TLS document 110-4 filed 07/29/19 page 7 of 7

ANCHOR HEALTH SYSTEMS V.
DENNIS RADOWSKI, et al.
Cause No. 2:16-cv-00065-JVB-PRC 30(b)(6) deposition by ROBERT E. NIKSA
June 27, 2018

Page 69

1 conversation.
2  Q. Do you remember him -- anybody asking him
3 any questions?
4  A. No.
5  Q. Okay. So if there were any medical
6 records, which were actually presented to the
7 trustees, he wasn't there to see them, was he?
8  A. If there's any medical records that were
9 distributed to the trustees, he would have seen them
10 first.
11  Q. Okay. Do you remember him saying
12 anything? That he had seen the medical records?
13  A. I do not remember the discussion.
14  Q. And Jeff Jayko -- I assume he represents
15 the union?
16  A. Correct.
17  Q. As well as Marina Faz-Huppert?
18  A. Yes.
19  Q. And Mr. Karmel is the attorney for --
20  A. Correct.
21  Q. Do you remember anything that was said at
22 that meeting?
23  A. This was my first appeals meeting. I
24 think they welcomed me on board.
25  Q. That's what you remember?

Page 70

1  A. Pretty much.
2  Q. "Welcome to the firm"?
3  A. You know, that's pretty much it.
4  Q. Just over Exhibit 5 -- you understand
5 that -- the controversy that exists in this lawsuit
6 really deals with two issues. It's, you know, who is
7 primary and who is secondary between the two
8 insurance companies versus Medicaid, and also the
9 issue of custodial care -- whether that really was
10 custodial care or not.
11      Do you understand that?
12  A. Yes.
13  Q. Okay. So if a court were to find that it
14 was not custodial care, then the only amount that you
15 feel that the fund would have to pay is that BCBS --
16 BCBS amount that's right there?
17  MR. TORRES: Are you referencing Exhibit 5?
18  MR. O'HARA: Yes. Referencing Exhibit 5.
19 BY THE WITNESS:
20  A. I don't know if that's the only thing
21 that could be charged. I don't know --
22 BY MR. O'HARA:
23  Q. But assuming that's a complete thing from
24 Anchor and assuming those were accurate -- the
25 charges they submitted and --

Page 71

1  A. And assuming that Anchor is in Blue Cross
2 Blue Shield --
3  Q. Yes.
4  A. -- and assuming that you get discounts as
5 much as 50 percent --
6  Q. Okay.
7  A. -- yeah, I would say that's probably
8 correct.
9  Q. Okay.
10  A. But there's lot of "ifs" there.
11  MR. O'HARA: Pass the witness.
12  MS. STEWART JOHNSON: I have no further
13 questions.
14  MR. TORRES: No further questions.
15  THE REPORTER: Signature? Reserve?
16  MR. TORRES: Yes.
17           (WHEREUPON, at 11:15 a.m.,
18            the deposition was
19            concluded.)

Page 72

CERTIFICATE
OF
CERTIFIED SHORTHAND REPORTER

I, APRIL D. HARGETT, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 84-4735, do hereby certify:
    That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;
    That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;
    That the said deposition was taken before me at the time and place specified;
    That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action.
    IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 11th day of July, 2018.

*April Hargett*
April D. Hargett, CSR
License No. 084-004735